**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **CHIMENE HAMILTON ONYERI (1)** | § | |
| | § | **A-22-CV-00800-DAE-SH** |
| **v.** | § | **A-16-CR-00241-DAE-1[1]** |
| | § | |
| **UNITED STATES OF AMERICA** | § | |

<u>**REPORT AND RECOMMENDATION**</u>
<u>**OF THE UNITED STATES MAGISTRATE JUDGE**</u>

**TO:    THE HONORABLE DAVID A. EZRA**
**SENIOR UNITED STATES DISTRICT JUDGE**

Before the Court are Chimene Hamilton Onyeri's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody, filed August 8, 2022 (Dkt. 368); his Memorandum of Law in Support, filed October 5, 2022 (Dkt. 375); the Government's Response in Opposition to the Motion to Vacate Conviction and Sentence, filed March 21, 2023 (Dkt. 380); and Onyeri's Reply, filed October 6, 2023 (Dkt. 391).[2]

### I.  Background

Petitioner Chimene Hamilton Onyeri shot Texas state judge Julie Kocurek four times in the face and upper torso in an attempt to avoid prison. Onyeri was convicted in this Court on seventeen counts of RICO violations, including the predicate offense of attempted capital murder, and sentenced to life imprisonment. The Fifth Circuit affirmed his conviction and sentence in a published opinion, *U.S. v. Onyeri*, 996 F.3d 274 (5th Cir. 2021). Onyeri now seeks to vacate his conviction and sentence under 28 U.S.C. § 2255.

---

[1] This case originally was assigned to the Honorable Lee Yeakel. After Judge Yeakel retired on May 1, 2023, the case was transferred to the Honorable David A. Erzra.

[2] On August 8, 2022, the District Court referred the Motion and related pleadings to this Magistrate Judge for a report and recommendation, pursuant to 28 U.S.C. § 636(b), Rule 1(e) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, and the District Court's Standing Order for Court Docket Management. Dkt. 370.

**A.  Facts[3]**

Onyeri's criminal activities "involved a multitude of misdeeds that spanned almost half a decade." *Onyeri*, 996 F.3d at 276. Relevant here, from January 2012 through November 2015, Onyeri led his co-conspirators "in conducting the affairs of an enterprise through a pattern of racketeering activity consisting of multiple acts of mail fraud, wire fraud, bribery of a public official, identity theft, access device fraud, money laundering, conspiracy to commit money laundering, and murder." Dkt. 231 at 22. After serving three years in prison, and while on bond for other state felony charges including violent crimes, Onyeri was arrested and charged in Texas state court for some of his fraudulent activity. *Onyeri*, 996 F.3d at 277. He remained in state custody for one year and attempted to continue to lead his criminal enterprise from prison. *Id.*

The Honorable Julie H. Kocurek, a Texas state judge for the 390th District Court in Austin, was assigned to Onyeri's case. *Id.* Onyeri pled guilty to the charges stemming from his 2012 arrest and Judge Kocurek placed him on three years' deferred adjudication probation, under which he would not face conviction for those charges if he successfully completed probation. *Id.* But after two-and-a-half years, following allegations that Onyeri had engaged in fraudulent use of debit cards in Calcasieu Parish, Louisiana, the government moved to proceed with an adjudication of guilt. *Id.* Judge Kocurek later testified that "she insisted the District Attorney's Office move quickly with Onyeri's case," reset the case for a hearing, and "suggested Onyeri may face six to seven years in prison." *Id.*

On Friday, November 6, 2015, two days before the scheduled hearing, Onyeri placed a trash bag in front of Judge Kocurek's driveway. As the family returned home from a high school football game, Judge Kocurek's 15-year-old son, Will Kocurek, was driving her SUV, with

---

[3] The factual summary is drawn from the record, the Fifth Circuit opinion affirming the District Court's judgment, and the District Court's Findings of Fact and Conclusions of Law Regarding Defendant's Motion to Suppress. *See Onyeri*, 996 F.3d 274; Dkts. 188, 267.

Judge Kocurek in the passenger seat and her nephew and sister in the back seat. Dkt. 188 at 1. As Will pulled into the driveway, he noticed the bag and got out of the SUV to move it. *Id.* Onyeri then walked toward the driver's side of the vehicle and fired four to five shots through the driver's side window at Judge Kocurek, striking her in the face and arm. *Id.* at 1-2. At trial, Judge Kocurek testified that when Onyeri fired his gun, she was hit with "a wall of metal" and thought at that moment that she was "going to die" in front of her son, sister, and nephew. Trial Transcript, Dkt. 332 at 41:7-13. Judge Kocurek was seriously injured in the shooting, suffering multiple gunshot wounds. *Onyeri*, 996 F.3d at 277.

Onyeri fled in a getaway car. A co-conspirator testified that, when he got in the car, he said: "I got that bitch. I got that bitch." Trial Transcript, Dkt. 330 at 221:20-21. Onyeri testified that he was "happy" he shot Judge Kocurek and "scared the living hell" out of her son because "I had gotten my payback." *Id.*, Dkt. 334 at 5:17-6:7.

On November 9, 2015, law enforcement received a tip that Onyeri was responsible for the shooting. Investigators learned that there was an active warrant for Onyeri's arrest for felony larceny in Louisiana. *Id.* The Houston Police Department ("HPD"), along with investigators of the Gulf Coast Violent Offender and Fugitive Task Force, began a search for Onyeri in the Houston area, where he was known to stay. *Id.* During the investigation, officers learned that Onyeri was traveling in or associated with a silver Dodge Charger with black wheel rims. *Id.* As officers interviewed witnesses at Onyeri's father's house, HPD Officer Derek Uresti and Deputy U.S. Marshal Jason Gullingsrud spotted the Charger heading toward the house and began to follow it. *Id.* Uresti testified that the officers followed the car through the neighborhood, ultimately initiating a traffic stop when the Charger made an errant right turn. *Id.* Onyeri and several of his co-conspirators were arrested. *Id.*

During the traffic stop, officers observed cell phones on the rear floorboard of the driver's side of the Charger, including a "smashed" Samsung Galaxy cell phone later identified as Onyeri's phone. Dkt. 188 at 3. Officers had the Charger taken to a storage area until a search warrant was obtained. *Id.* Along with the warrant for the car, officers obtained state and federal search warrants for the cell phones recovered from the car and a separate warrant for cell-tower data. *Id.* Despite the damage to Onyeri's phone, investigators were able to obtain evidence showing that he was in Austin at the time of Judge Kocurek's shooting, as well as text messages and photos implicating him in the shooting and other crimes. Suppression Hearing Transcript, Dkt. 190 at 38:5-41:23.

**B.  Procedural History**

Onyeri and his co-conspirators were indicted in the Western District of Texas. Dkt. 3. A seventeen-count Superseding Indictment returned on December 20, 2016 charged Onyeri and his co-conspirators with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (Count One). Dkt. 72 at 2. The pattern of racketeering activity consisted of "multiple acts" of mail fraud, bribery of a public official, wire fraud, fraud in connection with identification documents, authentication features and information, access device fraud, conspiracy to commit money laundering, money laundering, and an act "involving murder." *Id.* at 4. Count One also included a "Special Sentencing Allegation" that Onyeri and his co-conspirators "did, with specific intent to commit the offense of the Capital Murder of Julie Kocurek, attempt to intentionally and knowingly cause the death of Julie Kocurek in retaliation for and on account of the service and status of Julie Kocurek as a Judge of the District Court." *Id.* at 7-8. The Superseding Indictment also charged Onyeri with conspiracy to commit mail fraud, in violation of 18 U.S.C §§ 1349 and 1341 (Count Two); aggravated identity theft, in

violation of 18 U.S.C. § 1028A(a)(1) (Counts 3, 5-9, and 11); conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349 and 1343 (Counts 4 and 10); and six counts of tampering with a witness (Counts 12-17). *Id.* at 8-34.

Onyeri pled not guilty to all charges. On January 10, 2018, he moved to suppress the information obtained from his cell phone, arguing that the officers did not have probable cause to initiate the traffic stop that led to the phone's seizure. Dkt. 154. The District Court held a multi-day evidentiary hearing on the motion, during which the Court heard testimony from Onyeri; Reginald Matthews, the driver of the vehicle; HPD Officer Uresti; and Deputy U.S. Marshal Gullingsrud. The District Court denied Onyeri's Motion to Suppress, finding that Uresti had probable cause to initiate the traffic stop. Dkt. 179; Dkt. 188.

Onyeri's jury trial commenced March 26, 2018 and lasted 20 days. Dkt. 207. Onyeri was represented at trial by attorneys Victor Arana and Lenard Martin Martinez. At trial, thousands of exhibits were introduced and many witnesses testified, including Onyeri. On March 26, 2018, the jury returned a unanimous verdict finding Onyeri guilty on all seventeen counts. Dkt. 236.

Onyeri moved for a new trial, arguing that the District Court should reconsider its decision to deny his Motion to Suppress; his conviction on Count One should be reversed because RICO's "pattern of racketeering activity" element is unconstitutionally vague; the jury instructions on Count One were erroneous and there was insufficient evidence to support a conviction; and the evidence could not establish the required mental state for attempted Capital Murder or to establish that the attempted Capital Murder was part of a pattern of racketeering activity. Dkt. 243. The District Court denied the motion for new trial. Dkt. 257. On October 2, 2018, the District Court sentenced Onyeri to a term of life imprisonment plus 24 months, a five-year term of supervised release, and $178,374.41 in restitution. Dkt. 269.

Onyeri filed a direct appeal, arguing that: (1) the District Court erred by admitting evidence obtained from the traffic stop because it was not supported by probable cause or reasonable suspicion, claiming that Uresti's testimony was not credible; (2) there was insufficient evidence to support his RICO conspiracy conviction on Count One; and (3) the District Court erred in ordering his monthly annuity payments to be garnished. The Fifth Circuit affirmed his conviction and sentence. *Onyeri*, 996 F.3d at 278-83. Onyeri did not file a writ of certiorari. He now brings this Motion to Vacate under 28 U.S.C. § 2255,[4] arguing that he was denied effective assistance of counsel and the government committed prosecutorial misconduct.

## II.  Legal Standards

### A.  Section 2255

Section 2255(a) permits a federal prisoner to file a motion "to vacate, set aside or correct" his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." Challenging a conviction and sentence with a Section 2255 motion is "fundamentally different from a direct appeal." *U.S. v. Samuels*, 59 F.3d 526, 528 (5th Cir. 1995) (quoting *U.S. v. Drobny*, 955 F.2d 990, 994 (5th Cir. 1992)). "Once the defendant's chance to appeal has been waived or exhausted . . . [courts] are entitled to presume he stands fairly and finally convicted." *U.S. v. Frady*, 456 U.S. 152, 164 (1982). The "general rule" is that "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." *Massaro v. U.S.*, 538 U.S. 500, 504 (2003). Thus, relief under Section 2255 "is reserved for transgressions of constitutional rights and for a narrow range of injuries

---

[4] Onyeri's Section 2255 Petition was timely filed because it was filed within one year after the time for seeking certiorari expired. 28 U.S.C. § 2255(f)(1); *Clay v. U.S.*, 537 U.S. 522, 532 (2003).

that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *U.S. v. Acklen*, 47 F.3d 739, 741 (5th Cir. 1995).

In a Section 2255 motion, a petitioner has the burden of sustaining his contentions by a preponderance of the evidence. *U.S. v. Clay*, 921 F.3d 550, 559 (5th Cir. 2019). On collateral review, courts view the facts in the light most favorable to the verdict. *Drobny*, 955 F.2d at 992.

## B. Sixth Amendment Right to Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To succeed on a claim of ineffective assistance of counsel, the petitioner must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Id.* at 687.

To establish deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

As for prejudice, a challenger must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

"Surmounting *Strickland's* high bar is never an easy task." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Judicial scrutiny of counsel's performance "must be highly deferential." *Strickland*, 466 U.S. at 689.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* (citation omitted).

### III.  Analysis

Onyeri argues that he was denied effective assistance of counsel when counsel failed to (1) impeach HPD Officer Uresti's testimony with his official police report during the suppression hearing; (2) properly prepare him to testify at trial; (3) argue that the government violated the Confrontation Clause; (4) move to dismiss Count One; and (5) argue on appeal that Uresti had testified falsely. Onyeri also argues that the government committed prosecutorial misconduct and violated his due process rights by knowingly using and failing to correct Uresti's allegedly false testimony.

### A.  Uresti's Police Report

Onyeri first argues that his trial counsel was ineffective for failing to impeach Uresti with his prior statements in his official police report ("Police Report"), Dkt. 381-1. Onyeri contends that "Uresti's Police Report did not mention that he was told to be on the lookout for the Dodge Charger with big black rims" or "that he was told that Onyeri was located inside [a] Dodge Charger with big black rims." Dkt. 375 at 23. Onyeri argues that the Police Report supports the position that "Uresti never had probable cause to stop the silver Dodge Charger and he was never

told of the silver Dodge Charger during any briefing. If a briefing did occur, there is a serious doubt that the silver Dodge Charger was mentioned as a possible vehicle involved in the offense." *Id.* at 20. Onyeri contends:

> Uresti made up the "silver Dodge Charger with big black rims" in preparation for this trial to justify his actions. At the time of the arrest, when everything was fresh in his mind and the matter was recent, Uresti failed to mention the silver Dodge Charger with big black rims as an important factor. By failing to utilize Uresti's official Police Report to undermine his testimony, the court rendered an order denying the motion to suppress. Had the report been used to impeach Uresti, there is a reasonable probability of a different outcome in the proceeding, and the claim would have been better preserved for appellate purposes.

*Id.* at 22.

Onyeri misrepresents Uresti's statements in his Police Report and fails to show how the Police Report undermines Uresti's testimony at the suppression hearing. Uresti states the following in his Police Report:

> ON 11/09/2015 AT 1903 HRS, I, OFC D.R. URESTI, RIDING UNIT 19G17E, WAS DISPATCHED TO CHECK BY WITH GULF COAST VIOLENT OFFENDER TASK FORCE AT 12320 BEECHNUT ST.
>
> I ARRIVED ON THE SCENE AT 1908 HRS AND OFC H. LE (19G25C) WAS ALREADY AT THE LOCATION. **WE WERE BRIEFED BY THE OFFICERS AND WERE ADVISED THAT THE SUSPECT, WAS WANTED FOR QUESTIONING REGARDING SHOOTING IN ANOTHER CITY.** OFC LE AND I DROVE TO 12300 BLK OF WELLINGTON PARK DR[5] AND US MARSHALS SEARCHED THE RESIDENCE FOR THE SUSPECT, HOWEVER, THE SUSPECT WAS NOT PRESENT.
>
> ***
>
> **WHILE ON THE SCENE, A SILVER DODGE CHARGER WITH BLACK RIMS (TXLP # ----) DROVE TOWARDS OUR LOCATION AND QUICKLY TURN SOUTHBOUND. US MARSHALS ADVISED MYSELF AND OFC LE THAT THE SUSPECT WAS INSIDE OF THE VEHICLE.**

---

[5] This was the location of Onyeri's father's house.

OFC LE GOT INTO MY PATROL VEHICLE AND WE SEARCHED THE AREA FOR THE SUSPECT'S VEHICLE. **WE DROVE TO BISSONNET AND DAIRY VIEW, AND OBSERVED THE SUSPECT'S VEHICLE TURN WESTBOUND ON TO BISSONNET DR FROM THE 9300 BLK OF DAIRY VIEW LN. THE VEHICLE FAILED TO TURN INTO THE LANE CLOSEST TO THE RIGHT HAND CURB AND TURNED INTO THE NUMBER 1 LANE.**

I ADVISED THE DISPATCHER OVER THE AIR AND I INITIATED A TRAFFIC STOP ON THE VEHICLE AT THE 12600 BLK OF BISSONNET ST. THE VEHICLE SLOWED DOWN BUT PROCEEDED TO TURN BACK EASTBOUND ONTO BISSONNET. I ACTIVATED MY EMERGENCY SIREN AND THE VEHICLE STOPPED ON THE ROADWAY. I ORDERED THE DRIVER TO PULL INTO THE PARKING LOT AT 12700 BISSONNET ST. THE DRIVER COMPLIED.

I APPROACHED THE DRIVER SIDE OF THE VEHICLE WITH MY PISTOL AT THE LOW READY. OFC LE APPROACHED THE PASSENGER SIDE. AS I GOT CLOSER TO THE VEHICLE, I ORDERED THE DRIVER, SUSP REGINALD MATTHEWS TO ROLL DOWN ALL THE WINDOWS OF VEHICLE. I IMMEDIATELY DETECTED A STRONG ODOR OF MARIJUANA EMITTING FROM INSIDE OF THE VEHICLE. I ORDERED SUSP MATTHEWS OUT OF THE VEHICLE AND I DETAINED HIM. OFC LE AND THE US MARSHALS ORDERED THE REMAINING SUSPECTS (SUSP JERMAINE YEHE, SUSP MARCELLUS BURGIN, AND THE POI) OUT OF THE VEHICLE AND DETAINED THEM.

Dkt. 381-1 at 78 (emphasis added). Uresti clearly states in his Police Report that before he initiated the traffic stop (1) he had been advised that Onyeri was traveling in a silver Dodge Charger with black rims; (2) the vehicle had been seen driving toward Onyeri's father's house; and (3) Uresti saw the vehicle make an illegal right turn.

While Uresti provided more details about the events leading up to the traffic stop at the suppression hearing, his testimony was entirely consistent with his previous statements in the Police Report. For example, Uresti testified that on the night of the traffic stop, he and other HPD officers were dispatched to a parking lot off Beechnut Street to meet with members of the Gulf Coast Violent Offenders and Fugitive Task Force ("Task Force"), which included Deputy

U.S. Marshals and local police officers. Suppression Hearing Transcript, Dkt. 190 at 108:13-09:23. Uresti testified that the meeting was "to discuss the plan of action and also inform me of what they were doing, the person of interest that they were looking for, the location." *Id.* at 111:3-5. The Task Force officers showed Uresti and other officers a photo of Onyeri and told them that he was "wanted for questioning regarding a shooting here in Austin." *Id.* at 111:6-24. The Task Force officers also gave Uresti and the other officers a description of the vehicle in which they believed Onyeri was traveling: a "silver Dodge Charger with black rims, black wheels." *Id.* at 112:6-11.

Uresti and other Task Force officers then were dispatched to Onyeri's father's house at 12300 Wellington Park Drive, "where they believed [Onyeri] was." *Id.* at 112:16-18. Uresti testified that he and the other officers searched the house and yard, but Onyeri was not there. *Id.* at 114:13-16. Uresti testified that he went back to his patrol vehicle, sat in the driver's seat, and began working on an unrelated incident report. *Id.* at 115:10-14. A couple of minutes later, Uresti heard one of the Task Force officers state: "[T]hat's the car." *Id.* at 115:25-16:1. Uresti then "looked back and saw the vehicle turn southbound." *Id.* at 116:1-2. He described the vehicle as a "silver Charger with the black wheels – oversized black wheels," which matched the description he had been given. *Id.* at 116:11-17. Uresti testified that he then "told Officer Lee to jump in the passenger seat so we could take off to look for the car." *Id.* 116:20-23. A few minutes later, Uresti and Lee saw the "distinct" Dodge Charger at a stop sign at the intersection of Bissonnet Drive and Dairy View Lane. *Id.* at 119:2-17. Uresti testified that he saw the Charger make an "improper" right turn into the inside lane on Bissonnet Drive. *Id.* 119:17-23.[6] He then activated his lights to initiate a traffic stop on the vehicle. *Id.* at 121:21-23.

---

[6] Uresti testified that making a right turn into the inside lane (closest to the median) instead of the outside lane (closest to the curb) is a violation of Texas Transportation Code Section 545.101. *Id.* at 120:17-24.

Onyeri fails to show how Uresti's Police Report contradicts Uresti's testimony at the suppression hearing. Accordingly, Onyeri's argument that his attorneys were deficient for failing to impeach Uresti's testimony with the Police Report is meritless. "Counsel cannot be deficient for failing to press a frivolous point." *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995). Because a failure to make a frivolous argument "does not cause counsel's performance to fall below an objective level of reasonableness," Onyeri has not established that his attorneys were deficient. *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998).

In addition, Onyeri alleges no facts to show a reasonable probability that, but for counsel's failure to impeach Uresti with the Police Report, the outcome of the suppression hearing or his trial would have been different. As stated, the District Court held an extensive evidentiary hearing on Onyeri's Motion to Suppress and heard testimony from many witnesses, including Onyeri, his co-conspirators, Uresti, and Deputy U.S. Marshal Gullingsrud. Gullingsrud, a member of the Task Force who also was assigned to search for Onyeri, testified that he was on the way to Onyeri's father's house when he was informed that "Onyeri was in a silver Charger with black rims" and that the vehicle had been seen by a Task Force member in the neighborhood. Suppression Hearing Transcript, Dkt. 190 at 75:20-76:4. Gullingsrud testified that after he stopped at 12383 Wellington Park Drive, he "saw the vehicle . . . that Onyeri was supposed to be in" – the "Silver Charger, black rims" – which was heading toward Onyeri's father's house. *Id.* at 76:17-77:17. Gullingsrud followed the Charger but did not see it make the illegal right turn because other patrol cars were between the Charger and Gullingsrud's vehicle. *Id.* at 81:7-25. Gullingsrud testified that after Uresti stopped the Charger, he helped arrest Onyeri and his co-conspirators. *Id.* at 84:1-12. Gullingsrud's testimony supports Uresti's testimony at the suppression hearing and Uresti's Police Report.

After hearing all the evidence and testimony, the District Court found that Uresti had probable cause to initiate the traffic stop, reasoning that:

> Investigators learned that Onyeri was in "a silver Dodge Charger with big black rims." A vehicle matching that particular description was observed in the area of Onyeri's father's home. The vehicle slowed down when it approached the block where Onyeri's father lived and suddenly turned south down an adjacent street. The court finds that the testimony of Gullingsrud regarding the description of the vehicle he had been provided was specific enough to raise reasonable suspicion for him and the other officers at Onyeri's father's residence at the time that Onyeri might be in the Charger that drove by the residence. Having been able to view the credibility and demeanor of each witness at the hearing on the motion to suppress, including Onyeri and Matthews, the court further finds Uresti's testimony that he observed the Charger make an illegal turn credible. The court concludes that based on the totality of the circumstances, Uresti had probable cause to stop the Charger for a traffic violation, and, even if the traffic stop fails, there was reasonable suspicion to believe that Onyeri, subject to an outstanding arrest warrant, was in the Charger that officers observed drive by Onyeri's father's residence and which Uresti stopped.

Dkt. 188 at 7-8.

As stated, to prove prejudice, Onyeri must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Onyeri does not show how use of the Police Report would have changed the District Court's ruling. "An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue." *U.S. v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). Onyeri satisfies neither prong of *Strickland*.

## B. Confrontation Clause

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause bars the admission of "testimonial

statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). "Testimony" is "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51. But "the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *Williams v. Illinois*, 567 U.S. 50, 70 (2012) (quoting *Crawford*, 541 U.S. at 59-60 n.9). The Sixth Amendment right to confrontation applies to suppression hearings as well as trials. *U.S. v. Daniels*, 930 F.3d 393, 405 (5th Cir. 2019).

Onyeri argues that defense counsel were ineffective for failing to object to Deputy U.S. Marshal Gullingsrud's testimony at the suppression hearing on Confrontation Clause grounds. As discussed above, Gullingsrud testified at the suppression hearing as to his involvement in the search for Onyeri on November 15, 2015. Relevant here, Gullingsrud testified that when he was "in route" to Onyeri's father's house, Task Force members told him

> that they had developed information from an interview at the father's house that Onyeri was in a silver Charger with black rims. And, shortly after that information was relayed, I was informed over the radio that somebody had seen the vehicle in the neighborhood and -- somebody had seen the vehicle in the neighborhood.

Suppression Hearing Transcript, Dkt. 190 at 75:20-25. Gullingsrud clarified that the "somebody" who had seen the vehicle in the neighborhood was "a task force member that had seen the vehicle." *Id.* 76:1-4.

Onyeri complains that the unnamed Task Force member "never testified" and that his defense counsel should have argued that this violated the Confrontation Clause. Dkt. 375 at 31. Onyeri is mistaken.

> Testifying officers may provide context for their investigation or explain "background" facts. Such out-of-court statements are not offered for the truth of the matter asserted therein, but instead for another purpose: to explain the officer's actions. These statements often provide necessary context where a defendant challenges the adequacy of an investigation.

*U.S. v. Kizzee*, 877 F.3d 650, 659 (5th Cir. 2017) (citation omitted). Thus, officers may testify on a tip they received for "the limited purpose of explaining why they were at a particular location" because such information is "simply background information showing the police officers did not act without reason." *U.S. v. Vitale*, 596 F.2d 688, 689 (5th Cir. 1979).

In *U.S. v. Hernandez*, 441 F.2d 157 (5th Cir. 1971), an officer testified that he received a tip that a specific vehicle would be used to smuggle heroin from Mexico into the United States, including the car's make, model, color, and license plate number. *Id.* at 163. This testimony was not hearsay because it was used to explain to the jury why the officers were following the vehicle and that they "did not act in vacuum." *Id.* at 164. Similarly, Gullingsrud's testimony was not hearsay because it was used to explain why officers were looking for a silver Dodge Charger with black rims. These were not accusations but background facts about the investigation. The testimony did not violate the Confrontation Clause.

## C. Appellate Counsel

Onyeri next argues that his appellate counsel, Edmond N. O'Suji, rendered ineffective assistance when he failed to argue on appeal that Uresti's testimony at the suppression hearing contradicted his statements in his Police Report. As discussed above, Uresti's testimony did not conflict with his statements in his Police Report. Nonetheless, O'Suji raised this argument in his opening appellate brief. In "Issue Two," O'Suji argued that Onyeri's Fourth Amendment rights were violated because the traffic stop was initiated without probable cause or reasonable suspicion. Case No. 18-50869, Dkt. 38 at 20. O'Suji also argued that "Officer Uresti's testimony

15

is not credible, rendering the traffic stop invalid." *Id.* The Fifth Circuit rejected the arguments, concluding that the officers had probable cause to make the traffic stop. *Onyeri*, 996 F.3d at 279. The Fifth Circuit specifically rejected Onyeri's argument that Uresti's testimony was not credible:

> Onyeri disputes the district court's finding that Officer Uresti's testimony was credible. The crux of his argument centers on Officer Uresti's responses that he didn't remember certain details of the traffic stop. Onyeri argues that Officer Uresti's failure to recall aspects of the stop undermines the district court's credibility finding, and therefore, any probable cause.
>
> Onyeri's contentions are misleading. Officer Uresti also answered, with certainty, many other questions about the traffic stop. For example, he testified that traffic was permitted to flow during the traffic stop and that the road was not obstructed. He also stated that his line of sight to the silver Charger was not obstructed in any way and that he had no doubt that he saw the Charger turn into the number one lane. These details are crucial to the determination of whether to stop the Charger, and whether the officers had probable cause. In contrast, many of the aspects of the stop that Officer Uresti could not remember were unimportant to the propriety of initiating the traffic stop.
>
> It is eminently plausible that the traffic stop occurred just as Officer Uresti explained; nothing in the record suggests otherwise. And the district court twice stated for our review that it found Officer Uresti credible. Furthermore, "the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses" at the suppression hearing and at trial. We cannot identify any clear errors in the district court's factual findings. Accordingly, we conclude that the district court correctly denied Onyeri's motion to suppress.

*Id.* at 279-80 (citation and footnote omitted).

That appellate counsel was unsuccessful on appeal does not mean that he was deficient. Onyeri does not show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. This ineffective of assistance of counsel claim also fails.

**D.  Onyeri's Testimony**

Onyeri next argues that his trial counsel rendered ineffective assistance of counsel when they allegedly failed to prepare him to testify at trial. He alleges: "During the recess after the government rested their case, Onyeri was advised by Defense Counsels to 'trust them' that he was required to testify during the defense." Dkt. 375 at 27. Onyeri claims that "[t]his was the first time this issue was addressed," and that his attorneys did not explain to him how to testify, respond to cross-examination, or "present his demeanor." *Id.* at 27, 29.

Onyeri's claim is conclusory because he does not explain how the preparation "would have changed what he said, and how he said it, such that the results of the proceedings would have been different." *Perez-Solis v. U.S.*, No. CR L-11-799-2, 2015 WL 12645531, at \*6 (S.D. Tex. July 13, 2015). "Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green*, 160 F.3d at 1042.

The evidence, moreover, contradicts Onyeri's allegation that defense counsel forced him to testify against his will. Trial Counsel Arana states in a sworn declaration that "it was against our advice" for Onyeri to testify at trial because counsel feared his testimony would alienate the jury. Dkt. 380-4 ¶ 15. Arana explains that Onyeri's "lexicon included extensive profanity, and his failure to acknowledge seemingly undisputed facts, and his arguing back and forth with the prosecutor at the suppression hearing, were among the most significant factors that we believed would alienate the jury." *Id.* Arana further states that, "from the beginning, the defendant made it clear to us that he was going to testify regardless of counsel's advice. Thus, the suggestion that defense counsel told him to testify and 'trust us' is inaccurate." *Id.* ¶ 14.

Onyeri's appellate counsel also disputes his allegations. In his affidavit, O'Suji states that "Onyeri informed me during our first meeting at the Pollock Federal Prison in Pollock, Louisiana, that it was his choice to testify on his behalf at trial." Dkt. 380-6 ¶ 1.

Onyeri cannot show that he was prejudiced by his counsel's alleged failure to prepare him to testify. Onyeri "was cocky, uncooperative, disrespectful and lied repeatedly" on the stand. Dkt. 259 at 8. He does not explain how any coaching by his attorneys could have changed the outcome of the trial. "Ultimately, the jury's decision not to believe Defendant was out of the hands of defense counsel." *Perez-Solis*, 2015 WL 12645531, at *6. This claim of ineffective assistance of counsel also fails.

## E. RICO Conspiracy Offense

As stated, Count One of the Superseding Indictment charged Onyeri with conspiracy to conduct or participate in an enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).[7] Dkt. 72 at 2. The "pattern of racketeering activity" included various acts of fraud; bribery of a public official; money laundering; conspiracy to commit money laundering; and, relevant here, "involving murder, in violation of Texas Penal Code Sections 15.01, 19.02 and 19.03."[8] *Id.* at 4. Onyeri argues that defense counsel was ineffective for failing to move to dismiss Count One because "[a]ttempted capital murder, as charged in the indictment is not listed [in the] definition of what constitutes a RICO activity" under 18 U.S.C. § 1961(1). Dkt. 375 at 34.

---

[7] "To prove a RICO conspiracy the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *U.S. v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).

[8] "To prove attempted murder, the State is required to prove that a defendant, 'with specific intent to commit [the offense of murder], . . . does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended.'" *Thetford v. State*, 643 S.W.3d 441, 448 (Tex. App.—Fort Worth 2022, pet. ref'd) (quoting Tex. Penal Code § 15.01(a)).

The RICO statute defines racketeering activity "to encompass dozens of state and federal offenses, known in RICO parlance as predicates." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 329-30 (2016). A predicate criminal act includes "any act or threat involving murder . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A). Several Courts of Appeals have found that attempted murder is a predicate offense under RICO. *See U.S. v. Nichols*, 76 F.4th 1046, 1055 (8th Cir. 2023) (stating that "[a]ttempted murder is an underlying "racketeering activity" under § 1961(1)); *U.S. v. Farmer*, 38 F.4th 591, 602 (7th Cir. 2022) ("'Racketeering activity' includes murder, attempted murder, arson, robbery, extortion, and drug trafficking."), *cert. denied*, 143 S. Ct. 841 (2023); *U.S. v. Pungitore*, 910 F.2d 1084, 1134 (3d Cir. 1990) (rejecting defendant's claim that indictment was fatally defective because § 1961(1)(A) "does not specifically mention attempted murder"); *see also U.S. v. Johnson*, 825 F. App'x 156, 166 (5th Cir. 2020) (per curiam) (stating that "attempted murder" is a predicate offense under RICO). And in Onyeri's direct appeal, the Fifth Circuit held that there was sufficient evidence to support Onyeri's RICO conspiracy conviction based on evidence presented at trial showing that Onyeri attempted to murder Judge Kocurek. *Onyeri*, 996 F.3d at 280-81.

Because attempted murder is clearly "any act or threat involving murder" under Section 1961(1)(A), Onyeri's defense counsel could not have been deficient for failing to move to dismiss Count One on this meritless ground. *See Evans v. Davis*, 875 F.3d 210, 218 (5th Cir. 2017) ("Obviously, counsel is not deficient for failing to make meritless suppression motions."). Onyeri cannot show prejudice because "prejudice does not arise from, failure to raise a legally meritless claim." *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990). This ineffective assistance of counsel claim also fails.

For these reasons, this Magistrate Judge recommends that the District Court deny Onyeri's claim that he was denied the effective assistance of counsel, in violation of his Sixth Amendment rights.

## F. Alleged Prosecutorial Misconduct

Related to his claim that his trial counsel was ineffective for failing to impeach Uresti's testimony with his Police Report, Onyeri argues that the government committed prosecutorial misconduct and violated his due process rights by failing to correct Uresti's allegedly false testimony during the suppression hearing and at trial. To establish a due process violation based on the government's use of false or misleading testimony, a defendant must show that (1) the testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false. *U.S. v. Fields*, 761 F.3d 443, 477 (5th Cir. 2014); *see also Giglio v. U.S.*, 450 U.S. 150, 153-54 (1972). As explained above, Onyeri's claim fails because he has not shown that Uresti's testimony was false.

In the alternative, Onyeri argues that the government withheld Uresti's Police Report containing impeachment evidence until late in the proceedings, in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* requires the movant to show that "(1) the evidence at issue is favorable to the defense, either because it is exculpatory or impeaching, (2) the prosecution suppressed the evidence, and (3) the evidence is material." *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018). Suppressed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *U.S. v. Bagley*, 473 U.S. 667, 685 (1985). Onyeri has shown none of these factors.

### IV. Evidentiary Hearing

Finally, Onyeri asks the Court to hold an evidentiary hearing on his Section 2255 Motion. "A motion brought under 28 U.S.C. § 2255 can be denied without a hearing only if the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief." *U.S. v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992); *see also* 28 U.S.C. § 2255(b). Onyeri is not entitled to a hearing because the motion, files, and record conclusively show that he is not entitled to relief. The Court recommends that the District Court deny his request for a hearing.

### V. Recommendation

For these reasons, this Magistrate Judge **RECOMMENDS** that the District Court **DENY** Chimene Hamilton Onyeri's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct his Sentence (Dkt. 368) and **DENY** his request for an evidentiary hearing.

**IT IS FURTHER ORDERED** that this case be removed from the Magistrate Court's docket and returned to the docket of the Honorable David A. Ezra.

### VI. Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See*

28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

### VII.  Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2255 Proceedings, the district court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant.

A COA may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* The Court further held:

> When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Id.*

In this case, reasonable jurists could neither debate the denial of Onyeri's Section motion on substantive or procedural grounds nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Accordingly, it is recommended that a certificate of appealability not be issued.

**SIGNED** on October 23, 2023.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE